UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PAUL ISAAC,
SAIEED B. KABIR,
JOSEPH T. BUTKIEWICZ, and
KEN DRISH,
individually and on behalf
of all those similarly situated,

        Plaintiffs,

v.

CHUBB CORP., d.b.a. CHUBB GROUP
OF INSURANCE COMPANIES;
UNDERWRITERS OF
LLOYD'S, LONDON;
ZURICH AMERICAN INSURANCE
COMPANY; and
NORTH AMERICAN SPECIALTY
INSURANCE COMPANY;

        Defendants.

04-12320 DPW RWZ

Civil Action No. _____

COMPLAINT

RECEIPT # 59152
AMOUNT $ 150.00
SUMMONS ISSUED 4
LOCAL RULE 4.1 ✓
WAIVER FORM _____
MCF ISSUED ✓
BY DPTY. CLK. MS
DATE 11/2/2004

MAGISTRATE JUDGE RBC

## INTRODUCTION

1.    This Complaint is brought by Plaintiffs against the Defendant insurance companies, set forth below as the "Defendant Insurers", for violations of Massachusetts General Laws ("M.G.L.") Chapter 93A, section 2, and M.G.L. Chapter 176D for bad faith settlement practices in connection with the conduct of the Defendant Insurers in the putative securities class action litigation pending in the United States District Court for the District of Massachusetts captioned *In re Xchange, Inc. Securities Litigation*, Civ. No. 01-10322 (RWZ) (hereinafter the "Underlying Action"). Specifically, the Defendant Insurers violated M.G.L. Chapter 93A and M.G.L. Chapter 176D by engaging in bad faith settlement practices in the Underlying Action,

1

including their failure to: (a) make a reasonable offer of settlement when liability became reasonably clear; (b) undertake a reasonable investigation of plaintiffs' claims; (c) settle claims under one insurance policy in order to influence the settlement of claims under another insurance policy; and (d) provide a reasonable explanation of the basis for their failure to make a reasonable offer of settlement.

2. In the Underlying Action, the Plaintiffs alleged that Defendants violated the federal securities laws by knowingly or recklessly materially overstating revenues and product capabilities for a period of time beginning on December 9, 1998 and ending September 29, 2000 (the "Class Period"), causing the stock price of Xchange, Inc. (a.k.a. Exchange Applications, Inc., and hereinafter referred to as the "Xchange" or the "Company") to trade at artificially inflated levels and damaging members of the class of investors who purchased the inflated stock during that time.

3. The named plaintiffs herein ("Plaintiffs") are among the Lead Plaintiffs appointed in the Underlying Action, where they brought suit on behalf of themselves and on behalf of all persons or entities who purchased Xchange common stock (the "Class") during the Class Period. Excluded from the Class were defendants in the Underlying Action, all senior level officers, employees, directors or partners thereof, members of the immediate families and their legal representatives, heirs, predecessors, successors, and assigns and any entity in which any of the foregoing has a controlling interest.

4. Had the Defendant Insurers conducted a reasonable investigation of the insureds' liability in the Underlying Action, and a reasonable investigation as to the damages in the Underlying Action, the Defendant Insurers would have determined, without Plaintiffs' assistance,

that liability and damages were reasonably clear for an extended period of time during which the Plaintiffs in the Underlying Action continued to conduct and extensive litigation program.

5. In addition, Plaintiffs made multiple presentations to the Defendant Insurers which established that liability was reasonably clear.

6. Plaintiffs also demonstrated that damages in the Underlying Action were huge. According to Plaintiffs' expert, Plaintiffs' damages (amount of artificial inflation over the true value) mitigated by sales price, and as limited by the Private Securities Litigation Reform Act, were $853,953,379 for the Class Period in the Underlying Action. Focusing just on market loss (difference between purchase and sale price and eliminating all arguments about the correct true value), the Class's loss was a staggering $861,710,966. Even adopting the view of the Defendants in the Underlying Action (the "Defendants"), that the Class Period was July 24, 2000 through September 29, 2000, a view which was denied by the District Court on three separate occasions, Plaintiffs' expert determined that damages were in excess of $240 million.

7. Plaintiffs' claims in the Underlying Action implicated the following five insurance policies:

| Coverage Layer | Company | Coverage |
| --- | --- | --- |
| 1. Primary | Chubb | $2 million ($350,000 deductible) |
| 2. Excess 1 | Lloyd's | $3 million ($2 - $5 million) |
| 3. Excess 2 | Zurich | $3 million ($5 - $8 million) |
| 4. Excess 3 | Lloyd's | $2 million ($8 - $10 million) |
| 5. Excess 4 | N.A. Specialty | $5 million ($10 - $15 million). |

8. In addition to the fact that liability and damages were reasonably clear in the Underlying Action, and, had Defendants performed a reasonable investigation, this fact would not have been in question, any cost/benefit or risk/reward analysis performed by a reasonable insurer would have recognized that the available insurance proceeds covered only a fraction of the total damages in the Underlying Action. Given the fact that liability was reasonably clear, no reasonable insurer would have failed to offer the proceeds of the insurance policies to eliminate the exposure to their clients. Here, the Defendants Lloyd's, Zurich and North American Specialty failed to offer a penny toward settlement of the Underlying Action.

9. Plaintiffs have been damaged by the Defendant Insurers' bad faith settlement practices as alleged herein.

## PARTIES

### *Plaintiffs*

10. Plaintiff Paul Isaac resides at 6 Pond View Road, Peabody, Essex County, Commonwealth of Massachusetts.

11. Plaintiff Saieed B. Kabir resides at 673 Invermere Drive, Sun Prairie, Wisconsin.

12. Plaintiff Joseph T. Butkiewicz resides at 601 Seaway Drive, Ft. Pierce, Florida.

13. Plaintiff Ken Drish resides at 5708 Hunt Road, Cedar Rapids, Iowa.

### *Defendants*

14. Defendant Chubb Corp., d.b.a. Chubb Group of Insurance Companies ("Chubb") is incorporated in the State of New Jersey and has its principle place of business at 15 Mountain View Road, Warren, New Jersey. Chubb sold the primary layer ($2 million) of directors' and officers' liability insurance ("D&O" insurance) in the Underlying Action in a policy titled,

"Initial Public Offering and Executive Liability & Indemnification Policy."

15. Defendant Underwriters at Lloyd's, London ("Lloyd's") is not incorporated. It is a British insurance market. It serves as a meeting place for its members, who come together to pool and spread risk. Lloyd's sold the second layer ($3 million) of D&O insurance to the defendants in the Underlying Action. Lloyd's also sold the fourth layer ($2 million) of D&O insurance to the Defendants in the Underlying Action. These policies specifically state that Lloyd's "will submit to the jurisdiction of a Court of competent jurisdiction within the United States."

16. Zurich American Insurance Company ("Zurich") is a private company located at 1400 American Lane, Schaumburg, IL. Zurich sold the third layer ($3 million) of D&O insurance to the Defendants in the Underlying Action.

17. North American Specialty Insurance Company ("North American" and, collectively with Chubb, Lloyd's and Zurich, the "Defendant Insurers") is located at 650 Elm Street, Manchester, New Hampshire. North American sold the fifth and final layer ($5 million) of D&O insurance to the Defendants in the Underlying Action.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

19. Venue is properly laid in this district pursuant to 28 U.S.C. § 1391(a) because Defendants were engaged in the business of selling insurance policies, including the insurance policies at issue in this case, in the State of Massachusetts. In addition, a substantial part of the

events or omissions giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

### I. The Original Complaint

20. In February 2001, Plaintiffs filed their original Complaint against defendant Xchange, the CEO of Xchange, Andrew Frawley, as well as officers F. Daniel Haley, David F. McFarlane, and Robin Green, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78t(a) (the "Exchange Act") and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated under Section 10(b) by the Securities and Exchange Commission (the "SEC").

21. The original Complaint alleged a class period beginning on July 24, 2000 and ending on September 29, 2000, and a class that included all persons or entities (with various defined exceptions) who purchased shares of Xchange common stock during the Class Period. Plaintiffs alleged that Defendants issued various statements during this period discussing contracts entered into by the Company, without disclosing that the Company needed to change to a more conservative method of revenue recognition as to such contracts, which would negatively impact the Company's reported results. These statements and accounting machinations caused the price of Xchange stock to trade at artificially inflated prices throughout the defined period.

22. On September 29, 2000, when the Company finally announced the need to change to "percentage of completion" or "contract" accounting for the contracts entered into that quarter, Xchange's stock dropped $8.15 per share to $4.53 per share, losing 60% of its value. Volume on that date was 14.3 million shares, compared to an average volume of 494,000 shares per day for the period from September 1 through September 28, 2000. Plaintiff class members suffered

substantial losses.

## II. Plaintiffs' Consolidated Amended Complaint Details Non-Public Facts Making Defendants' Liability Reasonably Clear

23.     Plaintiffs' counsel engaged in extensive informal discovery after the original Complaint was filed, including interviews with former Xchange personnel which led to the filing of a Consolidated Amended Complaint (the "CAC") on August 3, 2001. The CAC, totaling 172 pages, detailed how Defendants should have always used contract accounting for the recognition of revenues on sales of software and alleged a Class Period beginning December 12, 1998 and ending September 29, 2000. The level of non-public detail in the CAC is perhaps unparalleled in its level of specificity and confirmed that Plaintiffs' counsel had spoken to those involved in various installations of Xchange's software products.

24.     The CAC contained three principal threads of misrepresentation. First, it detailed the applicable provisions of the Generally Accepted Accounting Principles ("GAAP") and how, given the nature of the Company's products and contracts, GAAP required Xchange to have used contract accounting, rather than the "out-of-the-box" method employed by Xchange throughout the Class Period. Unlike the revenue recognition method employed by Defendants, which permits upfront revenue recognition of all revenues allocated to license fees, and the recognition of services or maintenance revenues over the period rendered, contract accounting requires that *all* contractual revenues be recognized over the period during which Defendants perform under the contract (percentage of completion) or, in the case of new products, when the contract is completed (completed contract).

25.     The CAC alleged that Defendants' use of the wrong method of revenue

recognition resulted in Xchange's reported revenues and earnings throughout the Class Period being materially and artificially inflated. Once Xchange announced it needed to switch to contract accounting, it was never profitable again. Since the filing of the CAC, Xchange has become a defunct entity. In June 2004, a creditor of Xchange filed an involuntary petition for bankruptcy against Xchange.

26.     Second, the CAC detailed how Xchange improperly recognized $10 million in Q4 99 and Q1 00 from a sham transaction with a second software company, Microstrategy, Inc. ("MicroStrategy"). Both Xchange and MicroStrategy operated in the same business sector, which is termed "enterprise Customer Relationship Management" or "eCRM." Both companies sold eCRM software, as well as services to install and support the software, to companies that were interested in "real time" tracking of the effect of marketing campaigns on their customers. In other words, the products were designed to allow companies to track how different marketing campaigns influenced the behavior of their customers, and would allow the companies to get the relevant data virtually instantaneously. In March of 2000, the MicroStrategy announced that it was changing to contract accounting and would be forced to restate its recognition of revenues for numerous contracts, including its contract with Xchange, because MicroStrategy improperly used out-of-the-box accounting.

27.     Following MicroStrategy's revelation in the Spring of 2000 that it would be changing to contract accounting, numerous class action lawsuits were filed against MicroStrategy alleging that it overstated its revenues and earnings by failing to previously use contract accounting. Subsequently, MicroStrategy settled that suit for $153.5 million, $98.5 million of which came from MicroStrategy, with $55 million coming from its auditor.

28. Finally, the Complaint details Defendants' repeated misrepresentations about the capabilities and availability of Xchange's products.

### A. The CAC Detailed Allegations Regarding the Nature of and Difficulties of Installing Xchange's Software Products

29. The CAC alleged the following regarding Xchange's products and the difficulties of installing them and/or integrating them with their customers' pre-existing databases and/or software/hardware.

    a. Xchange began shipping its flagship software product, Valex, in July 1996. At the beginning of the Class Period, on December 9, 1998, Xchange went public. Thus, at the beginning of the Class Period, Xchange already had at least 2.5 years of operating history which it could take into account in applying the required revenue recognition practices.

    b. Valex was a product that the Company installed on top of the client's computer operating system. It was connected to the client's relational database management system - in essence, a computer database loaded with detailed information about customers. Valex was designed to query ("data mine") this database and utilize the extracted information to populate marketing campaigns designed by the client.

    c. Xchange's December 9, 1998 Initial Public Offering Prospectus stated that the Company intended to develop product extensions of Valex, as well as additional products to further improve customer relationship management. The Company also said it would pursue acquisitions that would bring desirable products or services.

    d. Indeed, the Company introduced a number of additional modules to be integrated with Valex. For example, on 12/7/98, Xchange announced Valex Release 2.1, containing Model Connect which, when used with Valex, would ostensibly permit users to

"dynamically score customer segments by importing statistical models from SAS Institute's Enterprise Miner software directly into marketing campaigns." Then, on 7/26/99, Xchange announced the shipment of Valex Release 3.0 which included "two new major modules – Valex Response Manager and Valex Response Analyzer." Response Manager was said to allow marketers to "describe the behavior that characterizes a response; track the group being evaluated for the response behavior; and define how long responses should be tracked." Response Analyzer offered "add-on reporting and decision support package that integrates DSS Suite from Micro strategy" and would be accompanied by "a set of response analysis reports."

    e.    Through the acquisition of Gino Borland, Inc. in August 1999, Xchange began offering eXstatic software for creating and executing web-based customer communications. Shortly thereafter, Xchange announced the purported availability of neXtricity, "for planning and synchronizing of customer communications across all channels in real time." On 1/31/00, when the company announced its year end financial results for 1999, it boasted that "[t]hroughout 1999, Exchange Applications expanded its offerings dramatically, from one product to six at the end of the year."

    f.    The additional modules further complicated the installation and integration of Valex, as they need to be integrated not just with customers' software and hardware, but also with the modules, which, in turn, need to be integrated with the customers' software and hardware.

    g.    In April 2000, Xchange re-branded its software products. Under the new Xchange Dialogue brand, were the following modules:

Xchange Dialogue for Marketing(formerly Valex)

        Xchange Dialogue for EMessaging(formerly eXstatic)
        Xchange Dialogue for Planning(formerly Campaign Optimizer announced in January 2000)
        Xchange Dialogue for Modeling(formerly Model Connect)
        Xchange Optimizer(formerly eXcentuate)
        Xchange Real Time (formerly neXtricity, introduced in November 1999).

        h.    Throughout the Class Period, Valex (later named Xchange Dialogue for Marketing) was the primary product for Xchange.

        i.    Xchange's typical contract entailed a software license agreement and a product schedule listing the license and services being purchased.  In most cases, the licenses were sold together with maintenance and implementation services, routinely consisting of analyzing and either substantially modifying or building in its entirety the customer's database; configuring Valex to interface with the customer's operating system and relational database system; installing Valex (and any other modules purchased by the customer and thereby required to be interfaced with Valex); training; assisting in developing initial marketing campaigns; and moving Valex into production at the customer's location for the purposes set forth in the contracts. Xchange's standard implementation Guide stated that "[t]ypical implementations take between 45 and 90 days."  In practice, however, it was common for Xchange to take six to twelve months, or more, to complete the process, since, for example, the installation process for additional modules required that they be installed sequentially, according to Xchange's Installation Guide. For example, after Valex's installation, further configuration was necessary before installing Response Manager, which had to be installed before installing Response Analyzer.

        j.    In addition to implementation services, Xchange provided extensive

11

consulting services, focusing on the design and construction of the database of customer information needed in order for Valex to operate. Although it was common for Xchange to enter into both the software license agreement and a separate services agreement at the same time, no software installation activities took place until Xchange had designed and modified or constructed the needed database, even though Xchange may have delivered a copy of the software to the buyer immediately upon execution of the software license agreement. Consulting services typically took place over a six to twelve month period.

### B. The CAC Detailed Why Xchange Used the Wrong Accounting Method

30. The CAC confirmed that Defendants were required to use contract accounting throughout the Class Period. Thus, the CAC alleged:

   a. Throughout the Class Period, the Company acknowledged that it had adopted Statement of Position 97-2 ("SOP 97-2") issued by American Institute of Certified Public Accountants (the "AICPA") in 1997, which details Software Revenue Recognition; stated it believed its revenue recognition practices complied with the requirements of 97-2; and proclaimed that the adoption of 97-2 did not have a material effect on the Company's financial performance.

   b. SOP 97-2 sets out the basic principles applicable to recognition of revenue related to software. According to SOP 97-2, if an arrangement to deliver software, either alone or together with other products or services, DOES NOT involve significant production, modification or customization of software in order to meet the customer's functionality, revenue can be recognized when the following criteria have been met: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred; (iii) the seller's fee is fixed or determinable; and

(iv) collectibility is probable.   Software arrangements satisfying *all* these conditions are considered "out-of-the-box" or "off-the-shelf" and revenue from sales of such software can be recognized as soon as all the above criteria have been met.  97-2 states that software "should be considered off-the-shelf if it can be added to an arrangement with insignificant changes in the underlying code AND it could be used by the customer for the customer's purposes upon installation."

    c.    On the other hand, if significant production, modification or customization of software is required, *or* if services are essential for obtaining the desired functionality at the particular customer's site, *or* if the arrangement involves multiple elements, such as both software and services which cannot be separately accounted for, then license fee revenue cannot be recognized immediately upon delivery of the software but, instead, all revenues under the contract must be recognized in accordance with "contract accounting" on either a percentage of completion, subscription basis(over the period of performance specified in the contract) or completed contract basis.  In order to account for each element of a multiple element arrangement (i.e. software, maintenance, implementation services, consulting services) separately, the revenue should be allocated to the various elements based on vendor-specific objective evidence of fair value ("VSOE").  If VSOE does not exist for *each* element, then all revenue must be deferred until either VSOE does exist or all the elements of the arrangement have been delivered (completed contract).

    d.    97-2 also explains that if the services element of a multiple element arrangement is essential to the functionality of any other element, then, services *cannot* be accounted for separately and contract accounting *must* be applied to both the software and service

elements of the arrangement. The services element is essential to functionality if:

- the software is not out-of-the box software;
- *the services include significant alternations to the features and functionality of the out-of-the-box software;*
- *building complex interfaces is necessary for the seller's software to be functional in the buyer's computing environment;*
- *the timing of payments for software is coincident with performance of services,* or
- milestones or customer-specific acceptance criteria affect the realizability of the software license fee. (Emphasis added).

  e. Defendants' software was not out-of-the-box software. Rather, services were essential to the functionality of the software at the customer sites and as the customers desired for the software to function. To make the software functional at a customer site, Defendants had to perform significant integration, customization and/or modification to the software and/or the customer database. A typical contract entailed a software license agreement and a product schedule listing the license and services being purchased. In most cases, the licenses were sold together with maintenance and implementation services.

  f. In addition to implementation services, Xchange provided extensive consulting services, focusing on the design and construction of the database of customer information needed in order for its software to operate. Although it was common for Xchange to enter into both the software license agreement and a separate services agreement at the same time, no software installation activities took place until Xchange had designed and modified or constructed the needed database, even though Xchange may have delivered a copy of the software to the buyer immediately upon execution of the software license agreement. Consulting services typically took place over a six to twelve month period.

  g. Moreover, the CAC detailed how the Company did not have VSOE for the

services element of its contracts since it only started to track the amount of services needed to install and integrate its software at the beginning of the Class Period and thereafter needed an extended period of time to compile accurate estimates of such services (required for VSOE to exist). The CAC details how these estimates never became accurate due to the periodic addition of modules to Valex, which created additional service requirements, as set forth above.

### C. The CAC Detailed Misstatements by the Defendants Concerning Their Products

31. The CAC detailed various misstatements made by Defendants concerning the efficacy and availability of a number of the companies software products.

### D. Many of the Allegations in the CAC Contained Non-Public Information, Which Could Not Have Come From Anywhere But Sources Inside the Company

32. Critically, the CAC contained specific allegations about the difficulties encountered by Xchange during installations at numerous sites for the Xchange products, the length of time it took to install products at such sites, and the failure of some of its products at various customer sites.

33. These allegations clearly came from people who were intimately familiar with the Company's products and the installation of those products at these sites.

34. As a result of the level of detail contained in the CAC, District Court held Plaintiffs complied with the stringent pleading requirements of the 1995 Private Securities Litigation Reform Act and Rule 9(b) of the Federal Rules of Civil Procedure in pleading the fraud with particularity.

## III. The Court Sustained Virtually All of the Allegations in the CAC

35. Defendants filed a Rule 12(b)(6) motion to dismiss the CAC. The parties fully

briefed their positions. Plaintiffs' briefs contained detailed summaries of the non-public facts pled in Plaintiffs' CAC which confirmed Defendants' misrepresentations and scienter, further demonstrating that their liability was reasonably clear.

36. The Court issued an Order on August 26, 2002, which unambiguously sustained Plaintiffs' Exchange Act Section 10(b) and 20(a) (controlling person liability) claims, in their entirety, against Xchange and the officer/director Defendants as pled in the CAC.

37. The Court, however, dismissed Plaintiffs' Securities Act Section 11 and 15(a) (controlling person liability claims) because, according to the Opinion, investors were put on notice of the fraud by virtue of certain disclosures made by MicroStrategy in April 2000 to the effect that it would be revising its previously disclosed financial results, in part, because it had prematurely recognized revenues from several major contracts, one of which was with Xchange. Thus, the court held that the applicable Statute of Limitations had run by the time the CAC was filed and the Section 11 claims did not relate back to the filing of the original Complaint.

38. The Court reached this conclusion even though, following Microstrategy's announcement, Xchange issued statements to the market reiterating that it had properly accounted for its revenues under the contract and further explaining that its accounting treatment had been blessed by Arthur Andersen's local branch and national office.

39. In explicitly sustaining the Exchange Act Section 10(b) and 20(a) claims in their entirety against the Xchange Defendants, the Court unambiguously held that Plaintiffs stated a claim for fraud under the securities laws, beginning on December 9, 1998 and ending September 29, 2000. In doing so, the Court held that the extension of the Class Period back, from July 24, 2000 as alleged in the Original Complaint, to December 9, 1998, as alleged in the CAC, did not

run afoul of the applicable statute of limitations.

## IV. Defendants' Motion for Clarification of the Duration of the Class Period is Flatly Denied

40. Seeking to seize on the Court's explanation of its dismissal of Plaintiffs' Securities Act claims contained in the August 26, 2002 Order, that Defendants would not have anticipated the Company's prospectuses being at issue in the case based on Plaintiffs' Original Complaint, Defendants, on September 4, 2002, filed a Motion for Clarification of the August 26, 2002 Order, arguing that the Court must have intended to also dismiss Plaintiffs' Section 10(b) claims, except for those set forth in the original Complaint.

41. On September 20, 2002, Plaintiffs filed their Memorandum in Opposition to Defendants' Motion, citing numerous Court Opinions holding that the addition, in an Amended Complaint, of new claims, new statements, extended class periods, and even class allegations relate back to the date of filing of the original complaint, so long as the conduct alleged in the Amended Complaint grows out of the course of conduct alleged in the original Complaint. Here, both Complaints related to Defendants' failure to use contract accounting and Defendants' overstatement of financial results.[1]

42. On October 8, 2002, the Court issued an Order squarely denying Defendants' Motion for Clarification.

---

[1] Plaintiffs feel that they have a very viable appeal regarding the dismissal of their Section 11 claims, since, Plaintiffs believe, they clearly related back to the filing of the original Complaint, having grown out of the same course of conduct: consistent overstatement of Xchange's financial results due to its failure to properly account for its revenues.

## V. Undeterred by Two Court Orders, Defendants Again Argued That the Class Period Begins on July 24, 2000

43. On November 20, 2002, Plaintiffs filed a Motion for Class Certification, requesting that the Court certify the class of persons or entities who purchased the common stock of Xchange, Inc. between December 9, 1998 and September 29, 2000, excluding the Defendants, all senior level officers, directors, or partners thereof, members of Defendants' immediate families and their legal representatives, heirs, predecessors, successors, and assigns and any entity in which any of the foregoing has a controlling interest.

44. Beginning November 22, 2002 and continuing into and through December of 2002, Plaintiffs began the process of gathering documents to support the allegations in the CAC by issuing subpoenas to numerous third parties, including analysts that covered the Company and customers of the Company.

45. On December 23, 2002, Defendants filed a Motion to Quash Plaintiffs' subpoenas, in part because discovery requests pertaining to any issues outside of a July 24, 2000 to September 29, 2000 class period were purportedly irrelevant.

46. Notwithstanding the fact that their position had twice been expressly rejected by the Court, Defendants continued to argue that the only claims left in the Underlying Action were the Section 10(b) and 20(a) claims pled in the original Complaint, with a Class Period beginning July 24, 2000. In support of their Motion to Quash, Defendants cited the exact same language from the August 26, 2002 Opinion which they relied on in the previously rejected Motion for Clarification.

47. Plaintiffs, for a third time, refuted this argument in their Opposition to Defendants' Motion to Quash filed on January 2, 2003. In their Opposition, Plaintiffs'

specifically refuted Defendants' iteration of the length of the Class Period, once again citing the August 26, 2002 Order denying Defendants' Motion to Dismiss and the October 8, 2002 Order denying Defendants' Motion for Clarification.

48. The Court did not immediately issue an order deciding the Motion to Quash and Plaintiffs proceeded to gather documents from third parties. Ultimately, the Court denied Defendants' Motion to Quash on March 24, 2004.

### VI. Plaintiffs' First Demand For Settlement, Within Policy Limits, and the First Attempt at Mediation Results in Defendants' Admission of their Failure to Perform an Adequate Investigation and Demonstrates Defendants' Failure to Make a Timely Offer of Settlement

49. Plaintiffs, on March 3, 2003, issued a settlement demand of $14.25 million, which, at the time it was made, was within the policy limits, even considering defense costs.

50. At the time this demand was made, Plaintiffs had not obtained Defendants' documents produced to the SEC or the documents Defendants produced in the MicroStrategy litigation, nor had they received the approximately 100 boxes of documents produced by MicroStrategy in response to the subpoena.

51. At a March 3, 2003 hearing, Defendants informed the Court that the Company had no employees or officers and that all of its assets were being auctioned off to pay down secured debt. The Defendant Insurers were therefore aware that, along with the Individual Defendants in the Underlying Action, they held the only proceeds available to settle the claims pending in the Underlying Action. Given the Company's inability to make a payment toward settlement, Defendants and Plaintiffs agreed that the parties would attempt to mediate a settlement. In an effort to preserve the proceeds of the policies for settlement rather than spending them to pay Defendants' counsel's fees, the parties further agreed that Defendants would then only produce