the discrete boxes of documents Xchange had previously produced as part of the SEC's investigation of MicroStrategy, documents Xchange produced during the SEC's investigation of Company for potential insider trading, and the documents Xchange produced to the Plaintiffs in the MicroStrategy class action.

52.     It was also agreed that Plaintiffs would continue with non-party discovery.

53.     The Defendant Insurers understood that, if a settlement was to occur, their active participation in attempting to reach such a settlement was more paramount than previously had been the case and that Plaintiffs would be obtaining and reviewing documents during the time such negotiations would occur. The parties agreed to schedule a mediation session with a jointly-acceptable mediator.

54.     The parties thereafter agreed to use Senior Judge David Mazzone of the U.S. District Court of Massachusetts as the mediator. A mediation date was set for June 23, 2003.

55.     Although Plaintiffs' CAC had been on file for almost two years, and the Defendants (and Defendant Insurers) had full access to all relevant witnesses and documents during this entire period, on June 18, 2003, Defendants cancelled the mediation because the Defendant Insurers asserted that they had not had an adequate opportunity to review their exposure.

56.     Upon information and belief, one of the reasons the Defendant Insurers cancelled this mediation was their belief that, as Plaintiffs' counsel continued their collection and review of non-party documents, and thus expend substantial additional time, they might be more willing to settle.

57.     Thus, on June 18, 2003, the Defendant insurers admitted that they had not

performed an adequate investigation:

    a.    in the approximately 22 months beginning on from August 3, 2001, when the CAC was filed;

    b.    in the approximately 10 months beginning on August 28, 2002, when Defendants' Motion to Dismiss was substantially denied;

    c.    in the approximately 8 months beginning October 8, 2002, when Defendants' Motion for Clarification was denied; and

    d.    in the approximately 2.5 months beginning March 3, 2003, when Plaintiffs made their initial demand, within policy limits, and agreed to mediation.

58.    Additionally, not only did the Defendant insurers fail to perform an adequate investigation as of June 18, 2003, they failed to make any offer of settlement at all, despite the reasonable clarity of liability and damages, which would only become more clear over time.

59.    Judge Mazzone was not available again until September 11, 2003, and the mediation was rescheduled for that date.

60.    The Defendant Insurers made no offer of settlement before September 11, 2003, seven months after Plaintiffs' demand, within the limits of coverage, was issued.

## VII.    The Defendant Insurers Were Put on Notice of the Extent of Plaintiffs' Damages Prior to the First Mediation

61.    On August 26, 2003, Plaintiffs sent to Defendants a preliminary damage analysis that indicated that, on the Class Period sustained by the court, damages were as high as $2.9 billion, and, using conservative methodology, $853 million. In the artificially abbreviated Class Period espoused by Defendants (but rejected repeatedly by the Court in the Underlying Action), damages were as much as $520 million, and using conservative methodology, in excess of $240

21

million.

62.    In response to the damage analysis submitted by Plaintiffs, the Defendant Insurers made no offer of settlement prior to mediation.

## VIII.   The First Mediation: Plaintiffs' Counsel Makes a Factual Presentation Which Further Confirmed Defendants' Liability

63.    On September 11, 2003, Plaintiffs, Defendants, and counsel to insurance carriers Chubb, Lloyd's, and Zurich attended the mediation session. At the behest of counsel to Defendants, Plaintiffs made a detailed factual presentation of the three areas of misrepresentations alleged in the Complaint, citing repeatedly to specific documents which supported Plaintiffs' allegations.

64.    As part of that presentation, Plaintiffs reiterated that their damages expert calculated Plaintiffs' Section 10(b) damages (amount of artificial inflation over the true value), mitigated by sales price, and as limited by the Private Securities Litigation Reform Act, to be $853,953,379 for the Class Period. Even focusing just on market loss (difference between purchase and sale price and eliminating all arguments about the correct true value), the Class' loss was estimated at a staggering $861,710,966. Assuming *arguendo,* the correctness of Defendants' principal position in the litigation, that the Class Period in the Underlying Action was 7/24/00 - 9/29/00 (which was then contrary to two Court orders and is now contrary to three Court orders), Plaintiffs' damages expert calculated damages in that short period to be over $240 million, sixteen times the total insurance coverage.

65.    Plaintiffs presentation contained numerous references to documentation that supported the allegations of the CAC and confirmed Defendants' liability in the case.

66.    Demonstrating the ultimate failure to act in good faith, no representative for North

22

American Specialty even attended the September 11, 2003 mediation and, as such, was not present to evaluate Plaintiffs' recitation of the facts giving rise to liability and damages.

67. Judge Mazzone, at the mediation, stated that the attending carriers offered $4 million to settle the case, and that he thought the case should then settle in the $6 to $10 million range. None of the counsel representing either Defendants or the Defendant Insurers disagreed with the Judge Mazzone's summary of Defendants' offer at that time.

68. The day after the mediation, Defendants' counsel Buhlman confirmed to Plaintiffs' Lead Counsel that he understood that the carriers had, in fact, offered $4 million. Specifically stated to be in response to Defendants' $4 million offer, Plaintiffs lowered their demand to $13.25 million.

## IX. After Four Months Without a Response to Plaintiffs' Decreased Demand, and After the Defendant Insurers Received Additional Evidence of the Insureds' Liability, the Defendant Insurers Withdrew Their Offer of $4 Million to Settle the Claims

69. Following the September 11, 2003 mediation session, Defendants' counsel requested that Plaintiffs' counsel identify, by Bates number, the documents cited in Plaintiffs' oral presentation insofar as they related to $10 million in revenue improperly recognized from certain transactions with MicroStrategy.

70. On September 25, 2003, Plaintiffs' counsel did so, outlining the issues again, and offered to do the same for Plaintiffs' proof regarding Defendants' need to have used contract accounting and in support of Plaintiffs' allegations that Defendants misrepresented the availability and capability of Xchange's products. Defendants did not accept this latter offer.

71. No response was thereafter received from the carriers for four months. Because of the impasse, Plaintiffs requested a conference before the Court to request that the case move

23

forward toward trial. When a response to Plaintiffs' reduced demand was finally made in January 2004, the Insurer Defendants asserted that they did not offer really $4 million at the mediation, but that they would then offer $1 million to settle the case. Plaintiffs responded by withdrawing their revised demand, but reiterated the original $14.25 million demand.

72.     Defendants and the carriers knew that, despite the pendency of the Motion to Quash, Plaintiffs' counsel were continuing to incur substantial legal fees as they assembled their proof, which included their review of an extensive quantity of documents produced by MicroStrategy, Arthur Andersen, analysts, and customers of the Company.

73.     In a letter dated January 19, 2004, Plaintiffs' Counsel informed the Court that the continued assertion of this position, as asserted in Defendants' Motion to Quash, was impeding Plaintiffs' ability to obtain a full production of relevant documents from non-parties. Plaintiffs' expressly referenced Defendants' argument concerning the length of the Class Period as one of the primary issues in Defendants' Motion to Quash impeding that effort.

74.     On March 17, 2004, in a conference with the Court regarding the status of the litigation, Plaintiffs informed the Court that Defendants continued assertion of the position that the shortened Class Period was the operative Class Period was also impeding the prospects for settlement. Defendants reiterated their position that the operative Class Period was the shortened class period, as stated in their Motion to Quash.

75.     On March 22, 2004, the Court, again rejecting Defendants' position, issued an Order denying Defendants' Motion to Quash.

76.     Thus, on three separate occasions, the Court has ruled that the Class Period for the Plaintiffs' Exchange Act Section 10(b) and 20(a) claims against Defendants in the Underlying

24

Action begins on December 9, 1998 and ends on September 29, 2000. On all three of those occasions, the Court rejected Defendants' argument that the Class Period begins on July 24, 2000. Notwithstanding the fact that the Defendants argument regarding a shortened class period was rejected in all three Orders, Defendants continue to act as though these Orders do not exist.

**X.    Plaintiffs' Second Mediation Statement Further Confirmed Defendants' Liability**

77.    In Spring 2004, the parties agreed to make one final attempt to mediate the case. The Parties agreed to use mediator Professor Eric Green and scheduled mediation for July 1, 2004. The parties further agreed that Plaintiffs would submit a written mediation statement one week prior to the scheduled mediation to both Professor Green and to Defendants.

78.    By June of 2004, Plaintiffs had reviewed over 350,000 documents, most of which were produced by third parties in response to subpoenas. Among other things, these documents confirmed that the Company had been sued at least three times for the failure of the Company's software products and the Company's inability to get the software to function as it had represented.

79.    In accordance with their agreement, Plaintiffs prepared a detailed, written, mediation statement (the "Second Mediation Statement").

80.    Plaintiffs' 28 page Second Mediation Statement was accompanied by approximately 50 pages of addenda setting forth facts confirming, quarter by quarter, Xchange's overstatement of its financial results and its misrepresentations regarding its transactions with MicroStrategy. Plaintiffs provided approximately 2000 pages of documents, appropriately segregated and referenced, confirming Plaintiffs' allegations in excruciating detail.

81.    The Second Mediation Statement vividly confirmed that the allegations contained

in the CAC were accurate.

82.     The Second Mediation Statement noted that the Individual Defendants sold over $23 million worth of their stock during the Class Period.

83.     Specifically, the Second Mediation Statement confirmed the following:

i.     Prior to the Class Period, the Defendants knew, or were reckless in not knowing, that customer databases needed significant modification for the Xchange software to be functional. Defendants provided the services that were essential to the functionality of the software, including systems integration and data warehouse construction;

ii.     During the Class Period, Defendants confirmed that they were at least reckless in not knowing that customer databases needed to be custom built for the Xchange software to function, that, at numerous customer sites, the implementation process took between six months and a year, and that some installations failed altogether;

iii.     The MicroStrategy transaction was an improper "swap" or "barter" transaction, and the revenues improperly recognized for this transaction caused the Xchange financials to be fraudulently overstated;

iv.     Defendants did not have sufficient data or history of specific product sales to fit within the purview of SOP 97-2, and thus contract accounting should have been applied. The failure to use contract accounting caused the overstatement of Xchange's financials throughout the Class Period;

v.     Defendants failed to effect proper delivery of their software during the proper reporting period on numerous contracts, thus accelerating revenue into quarterly results in violation of the federal securities laws;

26

vi.     Defendants did not properly execute the MicroStrategy contract during Q4 of 1999, and thus the revenues recognized in that quarter were recognized improperly, in violation of the federal securities laws;

vii.     Defendants materially overstated revenue in every quarter during the Class Period as a result of the improper recognition of revenues for, among other reasons, software that was not timely delivered, software that required significant installation services to install, and software that could not be installed and never achieved functionality; and

viii.     The Company had been sued by it customers for the failure of its products.

84.     The Second Mediation Statement also confirmed Defendants' scienter in the Underlying Action. Specifically, the Second Mediation Statement stated, with reference to individual documents annexed thereto as supporting evidence, *inter alia*:

i.     Various installations and contracts entered into prior to the Class Period which confirmed the essential nature of services to the functionality of Valex at the customer's sites and, thereby, the need to use contract accounting.

ii.     By the beginning of the Class Period, Defendants were well aware that Xchange's services were essential to the functionality of its products at every installation site. Among such evidence is the following:

(a)     On May 1, 1998, Defendant Frawley admitted that the preexisting databases at customers' sites did not typically possess the information needed by Valex and that Xchange "implement[ed] the data warehouse that would serve as the information store for Valex."

(b)     The Company's IPO Prospectus touted that: Valex was implemented through "proprietary consulting and *integration services.*" (emphasis added); Valex "*integrat[ed] with CIS*

27

*products and data warehouses* to perform enterprise-wide customer management..." *Id.* (emphasis added); and that "a central part of the [Company's services division] *was the design and customization of processes* for customer optimization." (Emphasis added).

(c) Based on information supplied by the Company to its lead underwriter in the IPO, on January 6, 1999, Alex Brown issued a report on Xchange stating that : (a) "*[t]he ability to integrate into an existing data warehouse infrastructure is a key to success* (*e.g.*, data mining tools, data loading, extracting, transformation, OLAP reporting tools);" (b) "*[t]he company currently delivers these capabilities to customers on a custom basis*, but we expect the Company to begin packaging more of this functionality out of the box;" (c) [Xchange] "*has developed significant experience in tailoring the Valex product to customers* in the financial services and telecommunications vertical markets;" and (d) *the Company's target goal was to have customers with data warehouses up and into production in 3 - 4 months.* (Emphasis added); and

(d) The Company's 1998 Form 10-K admitted that Xchange's CCM Solution was implemented through Valex "and proprietary consulting and integration services;" that Xchange's "integration services consulting group...delivers capabilities to Valex customers that *include data warehouse design and infrastructure development...*;" and, dispositively proclaimed, that "*[t]he Company believes that....service [is] critical to successful implementation of CCM and Valex.*" (Emphasis added).

iii.   Plaintiffs' Second Mediation Statement also detailed various events transpiring throughout the Class Period which confirmed Defendants' knowledge or reckless disregard of the Company's continuing need to a) custom build its software or b) provide implementation services which were essential to the functionality of Xchange's products at the customer's sites (*i.e.*, database builds or modifications and/or extensive installation services):

(a) Plaintiffs' CAC identified numerous contracts during the Class Period when it was necessary for Xchange to literally design and build a database at the client's site before it could begin its standard eight step implementation process for Valex which was

also necessary to achieving functionality. This information routinely confirmed the detail set forth in the CAC, premised on interviews with former employees;

(b)    Various companies which directly competed with Xchange, including Epiphany and MicroStrategy, announced during the Class Period that all or most of their contracts would require the contract method of accounting. The fact that others in the field, representing the Company's principal competitors used or changed to contract accounting demonstrates Defendants' recklessness in not doing the same. (Epiphany, a direct competitor, acknowledged in its 1999 third quarter Form 10-Q that most of its contracts are recorded pursuant to contract accounting). In March 2000, Microstrategy restated its prior financial results to apply contract accounting to its transactions, including the most recent Xchange transaction. Xchange chose to turn a blind eye to this development. Xchange's need to use contract accounting was further confirmed by the Company's April 3, 2000 acquisition of Knowledge Stream Partners and its June 8, 2000 acquisition of Customer Analytics, both of which used contract accounting.

(c)    Throughout and at the end of Q2 2000, Defendants touted the Company's sales of Suite 4.0. Defendants' statements issued at the end of the Class Period, confirming that Suite 4.0 required contract accounting is the equivalent of an admission that Q2 revenues were improperly recorded as to, at least, those contracts relating to the sale of Suite 4.0. In fact, the Company's November 14, 2000 Form 10-Q for the third quarter specifically acknowledged that services were integral to products released in both the second and third quarters of 2000:

> Many of the Company's latest generation of products, *released in the second and third quarter of 2000*, have a high dependency on services for delivery of the solution. The Company has concluded that the implementation services are essential to the customer's use of the packaged software products in certain arrangements where the Company is responsible for implementation services and therefore will be accounting for those contracts under the contract accounting method as the services are performed.

While these statements were false, since Xchange's implementation services had always been essential to the

29

functionality of Xchange's products and the products comprising the Suite were already being sold in late 1999 and early 2000, they nonetheless confirm that, at a minimum, Defendants should have restated its previously released results for the second quarter of 2000.

85.    Further demonstrating the Company's required use of contract accounting for *every* contract prior to the IPO and, at least, well into 1999, was the fact that Xchange did not track the amount of services required to install Valex or modify/build customers' databases as a prerequisite to such installations. Under 97-2, all revenues from multiple element contracts are required to be recognized under contract accounting if the Vendor Specific Objective Evidence of any element is unknown. Services are specifically defined to be an element of such a contract. Plaintiffs identified evidence expressly confirming these allegations.

86.    Based on the strength of the claims, the available insurance coverage, the carriers' failure to act in good faith, and the assets of the individual defendants, Plaintiffs' informed Defendants' counsel in the Second Mediation Statement that their demand was then $25 million.

**XI.    Defendants Postpone the Second Mediation**

87.    On June 25, 2004, six days prior to the scheduled mediation, Defendants filed a suggestion of bankruptcy in the Underlying Action and informed Plaintiffs that an involuntary petition for bankruptcy had been filed against Xchange on June 9, 2004. As a result, Defendants informed Plaintiffs that the mediation would have to be postponed until the bankruptcy court appointed a trustee. The trustee was appointed on July 8, 2004.

88.    On July 23, 2004, Bingham McCutchen, LLP moved to withdraw as counsel to Xchange because of actual or potential conflicts of interest that existed between Xchange and the Individual Defendants. On July 27, 2004, Judge Zobel of the District Court in the District of

30

Massachusetts granted the motion.

**XII.    Plaintiffs' 93A Demand Letter**

89.    On September 8, 2004, nearly two months had elapsed since the appointment of the trustee. Despite numerous communications with the mediator, and notwithstanding the fact that the Defendant Insurers had access to Plaintiffs' Second Mediation Statement for several months, the Defendant Insurers made no further offer of settlement.

90.    On September 8, 2004, Plaintiffs in the Underlying Action sent a 93A demand letter (the "93A Demand Letter") to counsel for the Individual Defendants in the Underlying Action, requesting that the 93A Demand Letter be forwarded to the Defendant Insurers.

91.    Counsel for Lloyd's and Zurich responded to Plaintiffs' 93A demand letter in a letter dated October 8, 2004 (the "October 8 Letter"), denying liability of Defendant Lloyd's and Defendant Zurich under Chapter 93A. The October 8 Letter stated, "Your clients have no documentary support to even a specter of liability, a fact that must not have escaped your notice, given that *you continue to respond to defense counsel's demands for an offer of proof with a mere recitation of the amended complaint allegations*." (Emphasis added).

92.    The October 8 Letter further stated, "As a *reliable* damage analysis will necessarily require knowledge as to the length of the class period, the insureds cannot put forth such an analysis until the class period is established." (Emphasis in original).

93.    In a letter dated October 11, 2004 (the October 11 Letter), Defendant North American Specialty responded to Plaintiffs 93A Demand Letter by adopting the positions set for in the October 8 Letter.

94.    Defendant Chubb offered no response to Plaintiffs' 93A Demand Letter.

95.    The Defendant Insurers' October 8 Letter and October 11 Letter confirm that representatives of the Defendant Insurers had not reviewed Plaintiffs' Second Mediation Statement or Plaintiffs' September 2003 recitation of documents which supported Plaintiffs' allegations regarding Xchange's misrepresentations pertaining to MicroStrategy. An analysis of either of Plaintiffs' presentations would have revealed that Plaintiffs did not "*continue to respond to defense counsel's demands for an offer of proof with a mere recitation of the amended complaint allegations*" as the Lloyd's and Zurich stated, and North American Specialty adopted, in the two letters.

96.    The Defendant Insurers' October 8 Letter and October 11 Letter further confirm that the Defendant Insurers' failure to make an offer of settlement is the product of their failure to perform *any* damage analysis *at all*. Even if the length of the Class Period really were an issue, which the Court says it is not, the Defendant Insurers have been perfectly capable of running their own damage studies for the two periods and weighing them against the risks of nonpayment. The Plaintiffs, in fact, did just that, and presented the results of the studies to counsel to Defendants in the Underlying Action, and to the Defendant Insurers, on multiple occasions.

97.    The Defendant Insurers' reiterated offer of $1 million in response to Plaintiffs' 93A Demand Letter, and subsequent to Plaintiffs' Second Mediation Statement, indicates that the Defendant Insurers' either (1) failed to review the Second Mediation Statement, or (2) blatantly and unreasonably ignored the demonstration of quarter by quarter overstatement of the financials by Defendants in the Underlying Action.

32

**XIII.  Mediation Rescheduled**

98.    Mediation was rescheduled for November 3, 2004, the only day for the remainder

of 2004 that Attorney Buhlman, the Individual Defendants' counsel in the Underlying Action,

represented that he was available.  As further detailed below at ¶120 herein, Defendants in the

Underlying Action never presented a factual basis in support of their defenses until November 1,

2004, just two days prior to the scheduled mediation and eleven months since the Defendant

Insurers withdrew their $4 million offer of settlement and offered $1 million to settle the claims.

## CLASS ACTION ALLEGATIONS

99.    Plaintiffs bring this action as a class action pursuant to Chapter 93A, § 9(2), on

behalf of themselves and on behalf of all similarly situated persons or entities who purchased

Xchange common stock (the "Class") from December 9, 1998 through September 29, 2000,

inclusive (the "Class Period").  Excluded from the Class are defendants in the Underlying

Action, all senior level officers, employees, directors or partners thereof,  members of the

immediate families and their legal representatives, heirs, predecessors, successors, and assigns

and any entity in which any of the foregoing has a controlling interest.  Also excluded from the

Class are defendants herein, all senior level officers, employees, directors or partners thereof,

members of the immediate families and their legal representatives, heirs, predecessors,

successors, and assigns and any entity in which any of the foregoing has a controlling interest.

100.    Plaintiffs are similarly situated to the persons they seek to represent because they

all purchased Xchange common stock during the Class Period and thus are putative members of

the class in the Underlying Action.  Plaintiffs and similarly situated purchasers of Xchange

common stock during the Class Period all would have been the beneficiaries of a settlement if

one would have been reached.

101.    Plaintiffs have suffered injuries similar to the injuries suffered by the members of
the Class as a result of the deceptive acts and/or practices employed by the Insurer Defendants as
alleged herein. These deceptive acts and/or practices operated as a course of conduct that
affected all Class members in the same manner.

102.    The Insurer Defendants' bad faith conduct in violation of Chapter 93A and
Chapter 176D affected all class members in the same manner.    Among the questions of law and
fact common to the Class are:

1.    Whether the Insurer Defendants violated Chapter 93A;

2.    Whether the Insurer Defendants violated provisions of Chapter 176D;

3.    Whether the Class has sustained damages, and if so, the appropriate
measure thereof.

103.    Additionally, Plaintiffs will adequately and fairly represent the interests of the
other similarly situation persons that they seek to represent. Plaintiffs have no interests
antagonistic to their fellow Class members. Plaintiffs have retained competent counsel
experienced in class action litigation and litigation under Chapter 93A and Chapter 176D to
further ensure such protection and intend to prosecute this action vigorously.

104.    The class action mechanism is the only effective means by which the class
members can obtain redress for the Insurer Defendants' alleged violations of Chapter 93A, since,
few, if any, individual class members would have the economic incentive to bring this lawsuit.
Since the damages suffered by individual class members may be relatively small, the expense and
burden of individual litigation make it virtually impossible for the class members to seek redress

34

for the wrongful conduct alleged. Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

105.    In addition, Plaintiffs satisfy Rule 23 of the Federal Rules of Civil Procedure ("F.R.C.P."). Under F.R.C.P. Rule 23, Plaintiffs bring this action on behalf of themselves and on behalf of all persons or entities who purchased Xchange common stock from December 9, 1998 through September 29, 2000, inclusive. Excluded from the Class are defendants in the Underlying Action, all senior level officers, employees, directors or partners thereof, members of the immediate families and their legal representatives, heirs, predecessors, successors, and assigns and any entity in which any of the foregoing has a controlling interest. Also excluded from the Class are defendants herein, all senior level officers, employees, directors or partners thereof, members of the immediate families and their legal representatives, heirs, predecessors, successors, and assigns and any entity in which any of the foregoing has a controlling interest.

106.    Plaintiffs hereby incorporate by reference the allegations set forth in paragraphs 103 through 108 as if fully set forth herein as class action allegations that specifically relate to F.R.C.P. Rule 23.

107.    The members of the Class are so numerous that joinder of all members is impracticable. As of March 20, 2000, there were over 25 million shares of Xchange common stock outstanding. Throughout the Class Period, Xchange common stock was actively traded on the NASDAQ National Market System. The precise number of class members is unknown to plaintiffs at this time but class members are believed to number in the thousands.

108.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have no interests antagonistic to their fellow Class members.

Plaintiffs have retained competent counsel experienced in class action litigation and Chapter 93A litigation to further ensure such protection and intend to prosecute this action vigorously.

109.    Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs' and all the class members' damages arise from and were caused by the conduct made by or chargeable to the Insurer Defendants.

110.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the class members to seek redress for the wrongful conduct alleged.  Plaintiffs know of no difficultly which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

111.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.

## CAUSES OF ACTION

### Claim I - All Defendant Insurers Violated M.G.L. Chapter 93A, Section 9 and Chapter 176D, Section 3(9)(d)

112.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

113.    All of the Defendant Insurers violated Chapter 93A, § 9(1) and Chapter 176D, § 3(9)(d) by refusing to pay claims without conducting a reasonable investigation based on all available information.

114.    The Defendant Insurers failed to conduct a reasonable investigation of the insureds' liability and exposure in the Underlying Action.

36

115.    Upon information and belief, the Defendant Insurers failed to conduct a

reasonable investigation by:

       a.    failing to review the Company's documents;

       b.    failing to interview the Defendants in the Underlying Action;

       c.    failing to interview employees of the Company;

       d.    failing to interview customers of the Company;

       e.    failing to investigate the veracity of the allegations of the CAC;

       f.    failing to review and investigate the facts identified by Plaintiffs' counsel

           at, and after, the First Mediation;

       g.    failing to review and investigate the Plaintiffs' Second Mediation

           Statement; and

       h.    failing to conduct a damage analysis to determine the damages in the case.

116.    In fact, Defendants Lloyd's, Zurich and North American Specialty stated in their

responses to Plaintiffs' 93A Demand Letter that Plaintiffs "*continue to respond to defense

counsel's demands for an offer of proof with a mere recitation of the amended complaint

allegations.*" (Emphasis added). This statement clearly admits that the Defendant Insurers'

failed to review: (a) Plaintiffs' September 2003 letter specifying the documents demonstrating

Defendants' misrepresentations regarding its dealings with MicroStrategy; (b) the Plaintiffs'

Second Mediation Statement, which was accompanied by approximately 50 pages of addenda

setting forth facts confirming, quarter by quarter, Xchange's overstatement of its financial results

and its misrepresentations regarding its transactions with Microstrategy; and (c) Plaintiffs'

approximately 2000 pages of documents attached to their Second Mediation Statement which

confirmed Plaintiffs' allegations.

117.    Defendants Lloyd's, Zurich and North American Specialty admitted in their
responses to Plaintiffs' 93A Demand Letter that, as of October 8, 2004, over three and a half
years after the litigation began, the Defendant Insurers had yet to conduct their own damage
analysis. This failure to conduct a damage analysis is particularly egregious in light of the fact
that Plaintiffs supplied counsel to the insureds Plaintiffs' preliminary damage analyses in March
2003, a more detailed damage analysis in August 2003 and again in the Second Mediation
Statement in June 2004.

118.    Further, so as to move past Defendants' superficial assertion that the July-
September 2000 period is the class period at stake in this litigation, Plaintiffs performed a
damage analysis limited to that period. That analysis revealed over $240 million in damages and,
contrary to the assertions of the Defendant Insurers, was based upon a market loss due to
disclosure analysis, not a purchase price, or artificial inflation, analysis.

119.    Defendants are not excused from their duty to conduct an investigation or review
the damages by virtue of their insistence that the Class Period is ambiguous, particularly in light
of the fact that their viewpoint as to the length of the Class Period has been argued and denied
three times by the Court in the Underlying Action. As Plaintiffs demonstrated, a damage analysis
done on either Class Period indicates damages that far exceed the $15 million in total insurance
proceeds.

120.    Until November 1, 2004, two days prior to the scheduled mediation and 11
months since the Defendant Insurers retracted their $4 million offer of settlement and offered $1
million, Defendants in the Underlying Action never identified any fact in support of their

defenses, but rather relied on fictitious legal arguments. In the November 1, 2004 mediation statement, Defendants relied on misinterpretation of SOP 97-2 and continued to rely on three legal positions that have been rejected by numerous courts. First, the position that the auditor, Arthur Andersen, approved of the Company's financial statements is of no moment. Arthur Andersen has been implicated in numerous private securities lawsuits and is no longer in business as a result of its conduct in violation of, among others, the federal securities laws. Further, Arthur Andersen removed the Xchange audit team days before Xchange switched to contract accounting on the last day of the Class Period. Second, the position that the SEC reviewed the Company's financials and tacitly approved them is factually incorrect. The SEC reviewed MicroStrategy's accounting of the Xchange transaction, and caused MicroStrategy to restate its recognition of the revenues in the transaction. During the SEC depositions of Xchange personnel, no inquiries relating to Xchange's accounting were permitted, since this was not an issue in the SEC investigation. Additionally, the SEC investigation at the end of the Class Period related to *insider trading*, not to the revenue recognition by the Company. Third, the First Circuit decision in *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002), negated Defendants' position that Xchange could not be liable because it did not restate past earnings when it switched to contract accounting, or, stated differently, that Defendants could not be liable because they did not admit that they used the wrong accounting method during the Class Period. Defendants are not absolved of liability because of their refusal to admit wrongdoing.

121.    Defendant North American Specialty did not attend the first mediation session, which took place on September 11, 2003, despite the fact that Plaintiffs' demand implicated the insurance policy that North American Specialty sold to the insureds.

39

122.    As a result of the foregoing, all Defendant Insurers violated Chapter 93A, § 9 and Chapter 176D, § 3(9)(d) and Plaintiffs and all similarly situated putative Class members were damaged thereby.

### Claim II - All Defendant Insurers Violated M.G.L. Chapter 93A, Section 9 and Chapter 176D, Section 3(9)(f)

123.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

124.    The Defendant Insurers failed to effectuate prompt, fair and equitable settlements of claims in the Underlying Action after liability became reasonably clear.

125.    A fair reading of Plaintiffs' Consolidated Amended Complaint demonstrates that Plaintiffs had spoken to witnesses with knowledge of the occurrences at various installations for Xchange's software and the information set forth in that Complaint strongly demonstrated the need to have used contract accounting throughout the Class Period. During the First Mediation session on September 11, 2003, Plaintiffs' counsel made an oral presentation to counsel to Defendants in the Underlying Action, as well as to representatives of Chubb, Lloyd's and Zurich outlining evidence compiled to date which supported the allegations of the CAC. As such, even if the Defendant Insurers failed to conduct a reasonable investigation on their own, the allegations of the CAC and this presentation served to establish that liability and damages in the Underlying Action were reasonably clear. Thereafter, counsel to Plaintiffs identified to Defendants in the Underlying Action the documents relied on by Plaintiffs' counsel in their presentation at the First Mediation.

126.    However, after offering $4 million to settle the Plaintiffs' claims, a fact which was confirmed by counsel to Defendants in the Underlying Action the following day, in January

40

2004, and after Plaintiffs repeatedly requested an update on the status of the Defendant Insurers' negotiation position, the Defendant Insurers withdrew the $4 million offer of settlement and offered $1 million to settle the Plaintiffs' claims.

127.   The backtracking engaged in by the Defendant Insurers constitutes failure to effectuate prompt, fair and equitable settlements of claims in which liability had become reasonably clear.

128.   Defendants failed to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear after Plaintiffs' Second Mediation Statement was submitted to counsel for Defendants. The Second Mediation Statement supplied approximately 2000 pages of evidence supporting Plaintiffs' claims in the Underlying Action. None of the allegations contained in the CAC, obtained from former employees at the Company, were contradicted. The Second Mediation Statement included damage analyses that indicated damages in excess of $240 million using conservative methodology and the artificially "short" class period that the Defendant Insurers espouse. The damage analysis for the Class Period actually sustained by this Court indicated total damages of $853,953,379.

129.   Defendants' response to the 93A Demand Letter, reiterating the "backtracked" offer of $1 million, was unreasonable given the fact that liability is reasonably clear and damages are, at a minimum, $240 million.

130.   Defendant Chubb failed to respond to the 93A Demand Letter.

131.   As a result of the foregoing, all Defendant Insurers violated Chapter 93A, § 9 and Chapter 176D, § 3(9)(f) and Plaintiffs and all similarly situated putative Class members were damaged thereby.

### Claim III - Defendant Lloyd's Violated M.G.L. Chapter 93A, Section 9 and Chapter 176D, Section 3(9)(m)

132.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

133.    Defendant Lloyd's failed to settle Plaintiffs' claims promptly, where liability had become reasonably clear, under the second layer of insurance policy coverage in order to influence settlement under the fourth layer of insurance policy coverage.

134.    Defendant Lloyd's failed to offer the full amount due under the second layer of coverage during the First Mediation, limiting the total offer of settlement to an unreasonable $4 million, in order to induce Plaintiffs to agree to a settlement offer which would preserve proceeds from the fourth layer of insurance, also issued by Lloyd's.

135.    Subsequently, in a further effort to prevent Plaintiffs from obtaining proceeds under the fourth layer of insurance, Defendant Lloyd's withdrew its settlement offer of $4 million.

136.    Stated differently, Defendant Lloyd's refused to offer settlement under the fourth layer of insurance in an effort to influence Plaintiffs to accept proceeds in the second layer of insurance, an unreasonably low offer of $4 million given that liability and damages were reasonably clear.

137.    As a result of the foregoing, all Defendant Lloyd's violated Chapter 93A, § 9 and Chapter 176D, § 3(9)(m) and Plaintiffs and all similarly situated putative Class members were damaged thereby.

42

### Claim IV - All Defendant Insurers Violated M.G.L. Chapter 93A, Section 9 and Chapter 176D, Section 3(9)(n)

138.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

139.    All Defendant Insurers failed to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

140.    From Plaintiffs' original demand on March 3, 2003 until September 11, 2003, neither Defendants nor the Defendant Insurers' provided an explanation of their basis for the denial of Plaintiffs' claim.  During that time, Defendants made no offer for a compromise settlement.

141.    As a result of the foregoing, all Defendant Insurers violated Chapter 93A, § 9 and Chapter 176D, § 3(9)(n) and Plaintiffs and all similarly situated putative Class members were damaged thereby.

### Claim V - All Defendant Insurers Violated M.G.L. Chapter 93A, Section 2

142.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

143.    Defendants violated Chapter 93A, § 2(a) by engaging in unfair or deceptive acts and/or practices in their failure to conduct a reasonable investigation of the claims asserted by Plaintiffs in the Underlying Action, by failing to make a reasonable offer of settlement when liability and damages were reasonably clear, by withdrawing an offer of settlement after that offer of settlement had been confirmed by counsel to Defendants, by attempting to influence settlements by leveraging one level of insurance coverage against another level of insurance

43

coverage, and by engaging in dilatory tactics throughout the course of the litigation in an effort to delay payment of insurance proceeds that will inevitably become due.

144.    As a result of the foregoing, all Defendant Insurers violated Chapter 93A, § 9 and Chapter 176D, § 3(9)(n) and Plaintiffs and all similarly situated putative Class members were damaged thereby.

## REQUESTS FOR RELIEF

A.    Plaintiffs request that this action be certified as a class action under M.G.L. Chapter 93A, §2 and/or under F.R.C.P. 23, and that the named Plaintiffs herein be appointed the named representatives of all others similarly situated.

B.    Plaintiffs demand judgment in the amount of their damages and the damages to the Class, together with multiple damages in accordance with Chapter 93A, § 9, and together with attorneys' fees, interest and costs as permitted by law, against the Defendant Insurers.

Dated: November 2, 2004

By their attorneys,
LAW OFFICE OF PETER A. LAGORIO

Peter A. Lagorio (BBO#567379)
63 Atlantic Avenue
Boston, MA 02110
Tel: (617) 367-4200
Fax: (617) 227-3384

JOHNSON & PERKINSON
Dennis J. Johnson
James F. Conway, III
1690 Williston Road
P.O. Box 2305
South Burlington, VT 05403
Tel: (802) 862-0030
Fax: (802) 862-0060

44